UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **LEGACY SEATING, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 13 C 02777 |
| v. ) | |
| ) | Chief Judge Rubén Castillo |
| **COMMERCIAL PLASTICS CO.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Legacy Seating, Inc. ("Legacy") brings this action for patent infringement, conversion, violation of the Illinois Uniform Deceptive Trade Practices Act, and trademark infringement against Defendant Commercial Plastics Company ("CPC"). (R. 1, Compl.) Presently before the Court is CPC's motion to dismiss the complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1). (R. 46, CPC's Mot.) For the reasons stated below, CPC's motion is granted in part and denied in part.

## RELEVANT FACTS

Legacy is an Illinois corporation with its principal place of business in Libertyville, Illinois. (R. 1, Compl. ¶ 1.) CPC is an Illinois corporation with its principal place of business in Mundelein, Illinois. (*Id.* ¶ 3.) In November 2007, Michael Price, owner of H. Wittur & Co., a supplier of tabletop products for parties and other events, initiated plans to design an updated version of a popular Italian plastic chair that could be sold in the United States. (R. 47-4, Ex. C, Price's Aff. ¶¶ 5-6.) In December 2007, Price approached James Watters, a friend with experience in furniture sales and relationships in the plastics supply industry, to discuss finding a plastic molder to create a mold from which the new chairs would be produced. (*Id.* ¶¶ 7-8.)

During January 2008, Price and Watters met with plastics molders at H. Wittur & Co.'s offices to discuss their ideas for the chair. (*Id.* ¶¶ 9-10.)

In February 2008, Price and Watters showed the existing Italian chair at a trade show to measure potential demand for a new chair. (R. 50-2, Ex. A, Price's Suppl. Aff. ¶ 4.) After the show, Price and Watters agreed to establish a company to "design, market, and sell" this new chair. (*Id.* ¶ 4.) Throughout early 2008, Price and Watters were in contact with CPC. (R. 47-4, Ex. C, Price's Aff. ¶¶ 9-13; R. 1, Compl. ¶4.) Around April 2008, CPC, Price, and Watters reached an agreement with CDM Tool & Manufacturing Co. ("CDM") that CDM would manufacture the mold needed for CPC to produce the chairs. (R. 47-4, Ex. C, Price's Aff. ¶13.) CPC agreed to pay for fifty percent of the mold manufacture cost, and a corporation to be formed by Price and Watters paid the remaining fifty percent. (*Id.*) Price and his wife paid his and Watters's portion of the down payment for the mold, $55,000.00, from their personal funds. (R. 50-2, Ex. A, Price's Suppl. Aff. ¶ 5.) H. Wittur & Co. contributed $5,500.00 to buy a computer program used to design the chair mold. (*Id.*) Legacy agreed to repay CPC for its expenditure towards the mold over time through a surcharge on the manufacturing price of the chair. (*Id.*) CPC alleges that its portion of the expenditure on the mold was approximately $391,050.00. (R. 13, CPC's Answer & Countercl. at 13.)

During April and May 2008, Price and Watters worked together to design the chair. (R. 50-2, Ex. A, Price's Suppl. Aff. ¶ 6.) They also hired an attorney to formally establish Legacy, which was incorporated on May 29, 2008. (R. 47-4, Ex. C, Price's Aff. ¶17.) Watters was named president and owned fifty percent of the company; Price was designated as vice president/treasurer, and Price's wife was named secretary and owned the remaining fifty percent of the company. (R. 47-4, Ex. C, Price's Aff. ¶17; R. 47-6, Ex. E, Legacy's Petition to Add Joint

Inventor ¶¶ 6-7.) During meetings with counsel to prepare for incorporation of Legacy, Price and Watters stated their intention to apply for a design patent that Legacy would own. (R. 50-2, Ex. A, Price's Suppl. Aff. ¶ 8.)

During July and August 2008, Watters and Price agreed to name the chair the "Mirage Chair" and worked with CDM to develop a stamp within the mold identifying the chair as "Mirage By Legacy Seating, Made in the USA, Patent Pending." (*Id.* ¶ 12.) In July 2008, Price authorized H. Wittur & Co. to issue to Watters a payment of $6,000.00, followed by a payment of $2,000.00 in August 2008, to compensate Watters for his work on the chair. (*Id.* ¶¶ 10-11.)

By October 2008, CPC received the mold and began to produce the Mirage Chair. (R. 47-4, Ex. C, Price's Aff. ¶16.) Through the end of 2008 and into 2009, sales of the Mirage Chair were lower than expected. (R. 50-2, Ex. A, Price's Suppl. Aff. ¶ 14.) During this time, Legacy alleges that CPC pushed for a surcharge on the chairs above the agreed amount. (*Id.*) Legacy alleges that CPC subsequently demanded that Legacy pay the entire mold cost plus a fifteen-percent increase over CDM's total charge. (*Id.*) CPC alleges that Legacy only sold a small number of chairs and then quit selling the chair. (R. 13, CPC's Answer & Countercl. at 12.) CPC further alleges that Legacy failed to pay the balance due for the chair mold, which was $270,165.00. (*Id.* at 13.)

Price and Watters met with patent attorney Dennis Gross in April 2009 to discuss the Mirage Chair and request that Gross prepare an application for a design patent. (R. 47-5, Ex. D, Gross's Statement ¶¶ 4-6.) Gross prepared an application, which named Watters as sole inventor and assigned the patent to Legacy, and delivered the application and power of attorney forms to Watters by e-mail on June 8, 2009. (*Id.* ¶¶ 7-8.) Legacy alleges that Price and Watters received

3

the documents and agreed that Watters would execute them on behalf of the company. (R. 50-2, Ex. A, Price Suppl. Aff. ¶ 13.)

By July 2009, the business relationship between Price and Watters had eroded, due in part to the pressure CPC applied by demanding the increased surcharges to repay the cost of the chair mold. (*Id.* ¶ 15.) Price attests that Watters was terminated in July 2009, with a buyout later negotiated with Watters in September 2009. (*Id.* ¶¶ 15-16.) Price attests that Watters refused to recognize this buyout or his termination. (*Id.* ¶ 15.)

During September 2009, Gross contacted Watters and Legacy to inquire whether Watters had approved the patent application and power of attorney documents. (R. 47-5, Ex. D, Gross's Statement ¶ 10.) Price told Gross's assistant that Watters had left Legacy and had no further contact with it. (*Id.*) At Price's request, Gross modified the patent application to name Price as the sole inventor, and assign the rights to Legacy. (*Id.* ¶¶ 10-11.) After reviewing the application for the Mirage Chair patent, Watters contacted Gross's assistant on September 29, 2009, and told her that the application "looks ok." (R. 50-4, Ex. C, Watters's Sept. 29, 2009 E-Mail at 1.) In the e-mail, Watters stated that Legacy was "having some internal problems with the partners" that would be "resolved shortly." (*Id.*) Two months later, Watters e-mailed Gross claiming to still be president of Legacy and stating that the company was working through legal problems. (R. 50-5, Ex. D, Watters's Nov. 29, 2009 E-Mail at 1.) In this e-mail, Watters requested that Gross modify the patent application to indicate that Watters and Price shared ownership of the Mirage Chair equally. (*Id.*) Watters also stated that he "wanted to get on record ahead of time" that he no longer wanted to transfer his rights to Legacy. (*Id.*)

In December 2009, after subsequent e-mail exchanges and separate meetings with Watters and Price, Gross advised Price that Watters could be added as a co-inventor to the patent

application, which had previously been submitted with Price listed as the sole inventor. (R. 47-5, Ex. D, Gross's Statement ¶ 21.) Gross further advised that Watters was under a fiduciary obligation to assign his interest in the patent to Legacy for two reasons: because Watters was president of Legacy at the time and authorized Gross to begin the application, and because Watters expressly agreed to assign the patent to the company. (*Id.*) During subsequent e-mail exchanges, Watters demanded that his fifty percent share of rights in the patent be assigned to another entity ,Watters & Associates. (R. 50-7, Ex. F, Watters's Dec. 3, 2009 E-Mail.) Watters eventually demanded that Gross withdraw the patent application. (R. 47-5, Ex. D, Gross's Statement ¶ 26.) Watters also refused to sign the application for joint ownership. (*Id.*) Gross filed a petition with the United States Patent and Trademark Office (USPTO) to add Watters to the patent application as a co-inventor without his signature, pursuant to 37 C.F.R. § 1.47(a). (R. 47-6, Ex. E, Legacy's Petition to Add Joint Inventor ¶¶ 1-3.) The USPTO issued the patent for the chair, Patent #D618006 ("the '006 patent"), to Price and Watters on June 22, 2010, with an accompanying assignment of rights from Price to Legacy. (R. 47-3, Ex. B, PTO Assignment at 1.)

Legacy alleges that since 2009, CPC has used the Mirage Chair mold to manufacture chairs for other customers, in violation of an agreement between the parties that the mold would be exclusively used for chairs ordered by Legacy. (R. 1, Compl. ¶¶ 6-10.) Legacy further alleges that CPC modified the mold to remove the "Mirage By Legacy Seating, Made in the USA, Patent Pending" mark, and that CPC has refused Legacy's demands to return the mold. (*Id.* ¶¶ 7, 10.) CPC admits that it removed the "Mirage By Legacy Seating, Made in the USA, Patent Pending" marking on the chair mold but denies the remaining allegations. (R. 13, CPC's Answer & Countercl. ¶¶ 6-10.)

## PROCEDURAL HISTORY

On April 12, 2013, Legacy filed a four-count complaint alleging patent infringement, conversion, violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2, and trademark infringement. (R. 1, Compl.) On July 12, 2013, CPC filed an answer that included counterclaims for patent invalidity, disputed patent ownership, patent unenforceability, violation of the licensing agreement between CPC and Legacy, and breach of contract for the chair production and the mold. (R. 13, CPC's Answer & Countercl.) CPC filed the instant motion to dismiss the complaint for lack of standing pursuant to Rule 12(b)(1) on April 11, 2014. (R. 46, CPC's Mot.) Legacy filed a response to the motion on May 16, 2014. (R. 50, Legacy's Resp.) CPC filed a reply on June 2, 2014, (R. 52, CPC's Reply), and Legacy filed a surreply on June 10, 2014, (R. 57, Legacy's Surreply).

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges whether the court has subject matter jurisdiction to hear a case. Fed. R. Civ. P. 12(b)(1). It is fundamental that if a court lacks subject matter jurisdiction, it "is without power to adjudicate" and the case must be dismissed. *Stewart v. United States*, 199 F.2d 517, 519 (7th Cir. 1952). When considering a factual challenge to jurisdiction, courts "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (quoting *Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008)). The plaintiff must produce "'competent proof'—that is a showing by a preponderance of the evidence—that standing exists." *Lee v. City of Chi.*, 330 F.3d 456, 468

(7th Cir. 2003) (quoting *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 862 (7th Cir. 1996)).

Standing is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "Standing in a patent infringement case is derived from the Patent Act, which provides: 'A patentee shall have remedy by civil action for infringement of his patent.'" *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001) (quoting 35 U.S.C. § 281)). A "patentee" is a party that owns the patent "either by issuance or by assignment." *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000). An assignment "confers constitutional standing on the assignee to sue another for patent infringement in its own name." *Intellectual Prop. Dev.*, 248 F.3d at 1345 (citing 35 U.S.C. § 261; *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891); *Ortho Pharm. Corp. v. Genetics Inst.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995)).

## ANALYSIS

Count I of the complaint is a claim for patent infringement asserting jurisdiction under 28 U.S.C. § 1338(a). (R. 1, Compl. ¶¶ 14-18.) CPC alleges that Legacy lacks standing to bring the patent infringement claim. (R. 46, CPC's Mot. at 1.) The Federal Circuit has held that only the patent owner or its assignee has standing to bring an infringement suit. *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1017-18 (Fed. Cir. 2001). Legacy and CPC do not dispute that Price, as a co-owner of patent '006, assigned his rights to Legacy. (R. 47-2, Ex. B, Assignment Record for '006 Patent; R. 50, Legacy's Resp. at 1; R. 47, CPC's Mem. at 5.) After Price's assignment to Legacy, Watters and Legacy became co-owners of the '006 patent, and Watters has not joined the suit as a plaintiff. The Federal Circuit has instructed that "[a]bsent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing."

7

*Israel Bio-Eng'g Proj. v. Amgen, Inc.*, 475 F.3d 1256, 1264-65 (Fed. Cir. 2007) (citing *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000)). In fact, the Federal Circuit has held that "one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998) (quoting *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997)).[1] Because Watters has not joined this suit, in order for Legacy to have standing in this case, it must establish that it is the sole owner by assignment of the '006 patent. As a result, this Court must resolve whether Watters retained his rights to the '006 patent or instead assigned his rights to Legacy. If Watters did not assign his rights, as CPC argues, then Legacy lacks the standing to sue absent joinder of Watters as a co-plaintiff. *See Waterman*, 138 U.S. at 255. Legacy argues, however, that under Illinois's "employed to invent" rule, Watters automatically assigned his rights to Legacy or, alternatively, that a valid assignment took place through the e-mail exchanges between Watters and The Hill Firm. (R. 50, Legacy's Resp. at 8-11.) The Court will consider each of Legacy's arguments in turn.

I. **Choice of law**

As a preliminary matter, the Court must determine the relevant law that governs patent assignments. The Patent Act states that patents "shall have the attributes of personal property," and "[a]pplications for patent, patents, or any interest therein, shall be assignable in law by an

---

[1] The Federal Circuit has held that "Rule 19 does not permit the involuntary joinder of a patent co-owner in an infringement suit brought by another co-owner." *DDB Techs, L.L.C. v. MLB Advanced Media*, 517 F.3d 1284, 1289 n.2 (Fed. Cir. 2008). The *DDB Technologies* court cited two exceptions to this rule, neither of which applies in this case. *Id.* The first exception permits an exclusive licensee to join the patent owner as an involuntary plaintiff in an infringement suit, and the second permits the involuntary joinder of a co-owner who has previously by agreement waived his right to refuse to join an infringement suit. *Id.*; *see also Ethicon*, 135 F.3d at 1468 (discussing the two exceptions in greater detail). Consequently, the Court will not require the involuntary joinder of Watters pursuant to Rule 19.

instrument in writing." 35 U.S.C. § 261. The Federal Circuit has held that "[c]onstruction of patent assignment agreements is a matter of state contract law." *Euclid Chem. Co. v. Vector Corrosion Techs., Inc.*, 561 F.3d 1340, 1343 (Fed. Cir. 2009) (quoting *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008)). Thus, in determining whether a valid assignment between Watters and Legacy took place, the Court will apply Illinois law.

## II. Whether Watters automatically assigned rights in the '006 patent to Legacy through the "employed to invent" rule

Legacy argues that Watters was hired by Legacy to invent the Mirage Chair, which created an automatic assignment of rights to Legacy under Illinois law. (R. 50, Legacy's Resp. at 8.) CPC argues that Watters retained his rights to the '006 patent because Watters and Price invented the Mirage Chair prior to Legacy's incorporation. (R. 47, CPC's Mem. at 6.) Legacy counters that a valid partnership existed under Illinois law once the two men agreed to establish the company in February 2008. (R. 50, Legacy's Resp. at 9.)

Illinois's "employed to invent" rule states that "an employer who hires or engages someone for consideration to devote his time to developing a product becomes the owner of that property which is developed and of any invention incident to it." *Heath v. Zenkich*, 540 N.E.2d 776, 780 (Ill. App. Ct. 1st Dist. 1989) (citing *Lion Mfg. Corp. v. Chi. Flexible Shaft Co.*, 106 F.2d 930 (7th Cir. 1939)). In assessing whether the employed to invent rule applies, "a court must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patent rights." *Banks v. Unisys Corp.*, 228 F.3d 1357, 1359 (Fed. Cir. 2000) (quoting *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (Fed. Cir. 1996)). "State contract principles provide the rules for identifying and enforcing implied-in-fact contracts." *Id.* (quoting *Teets*, 83 F.3d at 407).

9

In order for the employed to invent rule to apply, there must be a valid employer-employee relationship. *See, e.g.*, *E.J. McKernan Co. v. Gregory*, 623 N.E.2d 981, 1003-04 (Ill. App. Ct. 2d Dist. 1993). CPC argues that an employer-employee relationship is not present in this case because no entity existed to employ Watters at the time the chair was created. (R. 47, CPC's Mem. at 7; R. 52, CPC's Reply at 1-2.) Therefore, the Court must first establish that a valid partnership existed at the time of invention before it may analyze the applicability of the employed to invent rule.

### A.     Burden of proof for a partnership claim under Illinois law

When a party claims that a valid business partnership exists under Illinois law, that party bears the burden of proof. *Krebs v. Mini*, 368 N.E.2d 159, 164 (Ill. App. Ct. 2d Dist. 1977) (citing *Wagner v. Wagner*, 149 N.E.2d 770, 771 (Ill. App. Ct. 4th Dist. 1958)). This burden is typically a preponderance of the evidence. *Seidmon v. Harris*, 526 N.E.2d 543, 546 (Ill. App. Ct. 1st Dist. 1988) (citing *Smith v. Knight*, 71 Ill. 148, 151-52 (Ill. 1873)). However, CPC argues that pursuant to *Baker v. Baker*, 161 Ill. App. 430, 437 (Ill. App. Ct. 1st Dist. 1911), Legacy should be required to show the existence of a partnership by the higher burden of clear and convincing evidence. (R. 52, CPC's Reply at 1-2.) *Baker* states, in relevant part: "if the evidence in the case contains writings of parties . . . which distinctly point to a different relationship than that of co-partners, namely, to a relationship of employer and employe[e], the inference that any other relationship exists must be founded upon very clear and convincing evidence." *Baker*, 161 Ill. App. at 437. Courts have also relied on testimony by the parties in analyzing whether a partnership existed. *See Seidmon*, 526 N.E.2d at 547.

Here, the writings and testimony of the parties do not distinctly point to a different relationship than a partnership. The record contains Legacy's patent application, which includes

10

an affidavit Price in support of a petition to add Watters as a co-inventor. (R. 47-7, Ex. F, Legacy's PTO Application at 19-26.) Price attests that he and Watters agreed to form Legacy together, worked together as a joint enterprise, and collectively made decisions together, including hiring attorneys to facilitate incorporation and the protection of its' intellectual property. (*Id.*) CPC does not challenge the underlying facts in Price's affidavit, but instead argues that the documents submitted to the Court never mention a partnership, only Legacy. (R. 52, CPC's Reply at 2.) This fact is beside the point, as the evidence demonstrates that Price and Watters undertook a joint effort to design and produce the chair prior to the formation of Legacy. Because the evidence does not distinctly indicate a different relationship than a partnership, the Court will apply the preponderance of the evidence standard to Legacy's attempt to show the formation of a partnership under Illinois law.

### B. Whether a valid business partnership existed under between Watters and Price at the time of invention

CPC argues that Legacy cannot prove the existence of a partnership under Illinois law, and thus no valid employer-employee relationship exists in this case. (R. 52, CPC's Reply at 2.) Citing the Illinois Uniform Partnership Act, 805 Ill. Comp. Stat. 206/202 (2003), Legacy argues that the company existed as soon as Price and Watters began working together in late 2007, and it existed when Watters and Price allegedly came to an oral agreement in February 2008 to incorporate Legacy. (R. 50, Legacy's Resp. at 9.)

The Illinois Uniform Partnership Act defines a partnership as "an association of 2 or more persons to carry on as co-owners a business for profit formed under Section 202 of this Act, predecessor law, or comparable law of another jurisdiction." 805 Ill. Comp. Stat. 206/101(f) (2007); *see also Kennedy v. Miller*, 582 N.E.2d 200, 205 (Ill. App. Ct. 2d Dist. 1991) (citing *Peck v. Peck*, 157 N.E.2d 249, 257 (Ill. 1959)) (stating that a partnership arises when the

relevant parties "join together to carry on a venture for their common benefit, each contributing property or services and having a community of interest in the profits of the venture."). A written agreement is not required to form a partnership. *Seidmon*, 526 N.E.2d at 546. A partnership may exist pursuant to a verbal agreement, and "the surrounding circumstances may be sufficient to establish such an agreement." *Id.*

In the instant case, in or around February 2008 and thereafter, Price and Watters conducted meetings together with multiple businesses and came to agreements that included the authorization and purchase of the chair mold. (R. 47-4, Ex. C, Price's Aff. ¶ 9-14.) Price contributed resources to the partnership by paying the partnership's portion of the down payment for the chair mold, while Watters contributed time and energy by working with Price to design the chair and build a molding with modeling clay. (R. 50-2, Price's Suppl. Aff ¶ 5; R. 47-4, Ex. C, Price's Aff. ¶ 14.) Legacy's claim that a partnership existed would have been strengthened by evidence of a joint bank account, a formal partnership name prior to Legacy's formation, or stronger evidence of a joint fiduciary relationship. *C.f. Seidmon*, 526 N.E.2d at 546. Nonetheless, a preponderance of the evidence "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence.'" *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371-72 (1970) (Harlan, J., concurring) (internal alterations and quotation marks omitted)). Here, the joint work of Price and Watters and the later formation of Legacy are sufficient to persuade the Court that the existence of a partnership between Price and Watters prior to the formation of Legacy "is more probable than its nonexistence." *See id.* Thus, the Court proceeds to consider whether Watters was an employee of the partnership.

### C. Whether Watters was an employee of the Price/Watters partnership

Legacy argues that, though in a joint enterprise, a valid employer-employee relationship existed in this case because Watters was hired and compensated by Price with $8,000.00 and a fifty-percent share of Legacy, thus making him an employee of the partnership. (R. 50, Legacy's Resp. at 8.) CPC argues that even if a partnership existed prior to Legacy's incorporation, Watters's status as a partner precluded him from being an employee of the partnership. (R. 52, CPC's Reply at 2.)

Illinois law is clear that "[a] person cannot be an employee and a partner at the same time in the same business." *Tumminaro v. Tumminaro*, 556 N.E.2d 293, 298 (Ill. App. Ct. 2d Dist. 1990) (citing *Cook v. Lauten*, 80 N.E.2d 280, 282 (Ill. App. Ct. 1st Dist. 1948)).

Here, Price and Watters worked jointly on developing and designing the chair, as well as procuring the mold manufacturer and production partners. (R. 47-4, Ex. C, Price's Aff. ¶¶ 9-16.) Although Watters was compensated for his work, he was a fifty percent owner and named president of Legacy. (*Id.* ¶ 17.) His status is incompatible with the assertion that he was employed to invent the chair. Legacy cannot have it both ways—Watters may not be both a partner and an employee. *Tumminaro*, 556 N.E.2d at 298. Thus, Legacy's argument that Watters was hired to invent necessarily must fail.

Accordingly, the Court finds that Watters did not automatically assign its rights to Legacy under the "employed to invent" rule, and Legacy therefore lacks standing to sue for patent infringement under this doctrine.

### III. Whether Watters assigned his rights to Legacy through e-mail

In the alternative, Legacy argues that Watters assigned his interest in the '006 patent to Legacy by directing Gross to prepare a patent application and an assignment to Legacy of

Watters's rights in the '006 patent, and by subsequently manifesting his assent to the assignment via e-mail. (R. 50, Legacy's Resp. at 10-12.) Specifically, Legacy argues that the circumstances leading up to the e-mail Watters sent to The Hill Firm on September 29, 2009, and the text of the e-mail itself, convey Watters's acceptance and approval of the assignment. (*Id.* at 11.) CPC argues that Watters never assented to the assignment and refused to execute it, and therefore title never passed from Watters to Legacy. (R. 47, CPC's Mem. at 7.) Specifically, CPC points to Watters's e-mail from November 29, 2009, requesting that the patent be fifty-percent owned by Watters and fifty-percent owned by Price or his wife—not by Legacy—to show that Watters never intended to assign his rights. (R. 52, CPC's Reply at 3-5.)

As established above, whether a valid assignment of rights to a patent took place is a matter of state contract law. *See Euclid Chem. Co.*, 561 F.3d at 1343. Illinois law does not require any specific form of assignment; rather, "any document which sufficiently evidences the intent of the assignor to vest ownership of the subject matter of the assignment in the assignee is sufficient to effect an assignment." *Brandon Apparel Grp. v. Kirkland & Ellis*, 887 N.E.2d 748, 756 (Ill. App. Ct. 1st Dist. 2008) (quoting *Stoller v. Exch. Nat'l Bank of Chi.*, 557 N.E.2d 438, 443 (Ill. App. Ct. 1st Dist. 1990)). The validity of an assignment depends upon the intention of the parties, "and that intention is a question of fact to be derived not only from the instruments executed by them, but from the surrounding circumstances." *Id.* (quoting *Nw. Diversified, Inc. v. Desai*, 818 N.E.2d 753, 761 (Ill. App. Ct. 1st Dist. 2004)). "Whether an assignment has occurred is dependent upon proof of intent to make an assignment and that intent must be manifested." *Id.* at 756-57 (quoting *Nw. Diversified*, 818 N.E.2d at 761) (internal quotation marks omitted).

On September 17, 2009, Katie Andregg of The Hill Firm e-mailed Watters: "Just following up to see if you've reviewed the patent application, attached. Can you please sign the

[power of attorney] and assignment documents and send them back to us for filing if you believe the application to be correct." (R. 50-4, Ex. C, Sept. 2009 Email Exchange Between Hill Firm and Watters at 1.) On September 29, 2009, Watters responded with the following e-mail:

> I am sorry for the late response. It looks ok. Legacy Seating Inc is having some internal problems with the partners, one of them being me. We are trying to resolve them now.
> Can you send us a bill so I can guarantee payment of the invoice.
> We should have this resolved shortly.
> Thank you
> Jim Watters.

*Id.* Legacy argues that Watters' e-mail stating "It looks ok" is a manifestation of Watters' assent to the assignment. (R. 50, Legacy's Resp. at 11.) CPC counters that this statement merely represents Watters' approval of the patent application. (R. 52, CPC's Reply at 4.) The Court finds Legacy's interpretation of the e-mail unpersuasive. Andregg's email posited a question regarding the accuracy of Legacy's patent application, and the common sense reading of Watters's response is that he was indicating that the application was correct, not assenting to the assignment or power of attorney documents. Legacy provides no evidence that gives credence to its assertion that Watters' statement provides assent, and it is contrary to the plain reading of the e-mail that Watters was confirming that patent application "look[ed] ok," and that internal problems within Legacy needed to be resolved before executing the power of attorney and assignment documents.

The circumstances surrounding places the e-mail exchange places Legacy on no stronger footing. Price and Gross both attest that Price and Watters approached Gross to prepare documents to apply for the '006 patent, designating Watters as the sole inventor and assigning the rights to Legacy. (R. 50-2, Ex. A, Price's Suppl. Aff. ¶ 13; R. 47-5, Ex. D, Gross's Statement ¶¶ 7-8; R. 47-4, Ex. C, Price's Aff. ¶¶ 16-18.) The written materials, however, reveal

a strained relationship between Price and Watters at the time of the September 29th e-mail. In addition, Watters' November 29th e-mail specifically stated that Watters wanted to clarify "ahead of time" that he did not wish to assign his rights to Legacy. (R. 50-5, Ex. D, Watters's Nov. 29, 2009 E-Mail at 1.) This indicates that Watters intended only to approve the patent application and not the assignment in his September 29th e-mail. His November 29th e-mail makes no mention of a revocation of any executed assignment from Watters to Legacy, demonstrating that Watters never intended for the assignment to be executed. The written materials and surrounding facts in this case demonstrate that Watters did not intend to execute an assignment from him to Legacy. Legacy bears the burden of establishing by a preponderance of the evidence that the e-mail exchange constitutes a valid assignment, *see Lee*, 330 F.3d at 468, and the Court finds that Legacy has failed to meet this burden.

Seeking to avoid this result, Legacy also argues that Watters's September 29th e-mail had the legal effect of a signature on the assignment document. (R. 50, Legacy's Resp. at 11-12.) Legacy relies on the Illinois Electronic Commerce and Security Act, which states that "[w]here a rule of law requires a signature, or provides for certain consequences if a document is not signed, an electronic signature satisfies that rule of law." 5 Ill. Comp. Stat. 175/5-120(a). Legacy argues that "the law has consistently interpreted 'signed' to embody not only the act of subscribing a document, but also anything which can reasonably be understood to symbolize or manifest the signer's intent to adopt a writing as his or her own and be bound by it." (R. 50, Legacy's Resp. at 11-12) (quoting *Just Pants v. Wagner*, 617 N.E.2d 246, 251 (Ill. App. Ct. 1st Dist. 1993)). In *Just Pants*, the Illinois appellate court determined that the author's typed name at the bottom of the memorandum expressed the intent to be bound by the document and constituted a signature. 617 N.E.2d at 251. Similarly, in *Knolls Condominium Association v. Czerwinski*, 748 N.E.2d

1259 (Ill. App. Ct. 2d Dist. 2001), which Legacy also cites and which interprets section 5-120(a) of the Electronic Commerce Act, the court upheld the validity of a stamped signature in place of a handwritten one on a notarized document. The facts in this case are easily distinguishable, however, because it is a sentence in an e-mail, rather than a stamped or electronic signature, that Legacy argues constitutes a signature. (R. 57, Legacy's Surreply at 1.) Consequently, the Court finds that the Illinois Electronic Commerce and Security Act is inapplicable to the facts in this case. Although the statute does not define what constitutes an electronic signature, Watters' statement that "It looks ok" does not indicate his intent to adopt the assignment and thus does not serve as an electronic signature.

Accordingly, the Court finds that Watters did not assign his rights to Legacy through e-mail exchanges with The Hill Firm. Thus, Legacy has failed to meet its burden to establish by a preponderance of the evidence that it has standing to sue for the infringement of the '006 patent. The Court will, however, give Legacy sixty days to seek to file an amended complaint that joins Watters as a Plaintiff in order for it to pursue its' patent infringement claim.

## IV. Whether the Court may exercise supplemental jurisdiction over Counts II-IV

One final matter for the Court to resolve is whether it may retain supplemental jurisdiction over Counts II-IV, Legacy's state law claims for conversion, violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2, and trademark infringement. CPC argues that if the Court dismisses Legacy's federal law claim, it should also dismiss Legacy's state law claims because the Court has dismissed "all claims over which it has original jurisdiction." (R. 47, CPC's Mem. at 11) (quoting 28 U.S.C. § 1367(c)(3)). CPC fails to acknowledge, however, that at this time its' counterclaims assert federal law claims for patent invalidity pursuant to 35 U.S.C. §§ 102(f), 103(a) and 271, and patent unenforceability pursuant

17

to 37 C.F.R. § 1.56, (R. 13, CPC's Answer & Countercl. at 8-11), and therefore the Court possesses original jurisdiction over CPC's federal counterclaims.

Federal courts are authorized "to hear all claims that 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'" *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (quoting 28 U.S.C. § 1367(a)); *see also Rothman v. Emory University*, 123 F.3d 446, 454 (7th Cir. 1997) (quoting 28 U.S.C. § 1367(a)) (finding that 28 U.S.C. §1367(a) "permits district courts to maintain supplemental jurisdiction over counterclaims, whether compulsory or permissive, so long as the counterclaims 'are so related to' the original claims that they form the same case or controversy."). "Accordingly, judicial power to hear both state and federal claims exists where the federal claim has sufficient substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts." *Id.* (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *Myers v. Cnty. of Lake*, 30 F.3d 847, 850 (7th Cir. 1994)). "A loose factual connection between the claims is generally sufficient" to find that claims derive from a common nucleus of operative facts. *Id.* (citing 13B Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Federal Practice and Procedure § 3567.1, at 117 (2d ed. 1984)).

Here, the same set of facts give rise to both Legacy's state law claims and CPC's federal law counterclaims, and thus the factual connection is more than sufficient to ensure that Legacy's state law claims "derive from a common nucleus of operative facts" with CPC's federal law claims. *See id.* Because Legacy's state law claims derive from the same common nucleus of operative facts as CPC's federal law claims, Legacy's state law claims are part of the same case or controversy, and thus the Court is authorized to decide them. Therefore, given the current

state of the parties' pleadings, the Court will retain jurisdiction over Counts II-IV of Legacy's complaint.

## CONCLUSION

For the foregoing reasons, CPC's motion to dismiss (R. 46) is GRANTED IN PART and DENIED IN PART. The Court dismisses Count I of the complaint without prejudice but declines to dismiss Counts II-IV at this time. The Court requests that the parties re-evaluate their settlement positions in light of this opinion. The Court will hold a status hearing on September 25, 2014 at 9:45 a.m. in open court to set a final litigation schedule for this lawsuit. If Legacy does not seek to file an amended complaint after sixty days, Count I will be automatically dismissed with prejudice.

ENTERED: /s/ Rubén Castillo
Chief Judge Rubén Castillo
United States District Court

**Dated: August 20, 2014**